**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X

**TRUMP INTERNATIONAL HOTEL & TOWER,**

**Plaintiff,**

**- against -**

**CARRIER CORPORATION,**

**Defendant.**

-----------------------------------------------------------X

**OPINION AND ORDER**

**03 Civ. 759 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

# I. INTRODUCTION

Trump International Hotel & Tower ("Trump"), brings this diversity action alleging causes of action for negligence, breach of warranty, and breach of contract.[1] Trump provides permanent and temporary lodging for individuals at its hotel and condominiums located at One Central Park West, New York, New York (hereinafter "the Property").[2] Defendant Carrier Corporation ("Carrier") is in the business of manufacturing and servicing air-conditioning equipment.[3] On February 1, 1998, the parties entered into a five-year Service Agreement wherein

---

1 *See* Complaint, Ex. A to the Declaration in Support of Christopher Kendric, attorney for defendant ("Kendric Decl."), ¶¶ 15 - 27.

2 *See* Defendant's Statement Pursuant to Local Rule 56.1 ("Def. 56.1") ¶ 1.

3 *See id.* ¶ 2.

Carrier agreed to inspect, repair and maintain two large pieces of air-conditioning equipment (700-ton absorption chillers), which were manufactured by Carrier and purchased by Trump to cool the Property.[4] On July 8, 2002, one of the two absorption chillers froze, rendering it inoperable. As a result, Trump had to repair the damaged chiller and rent a temporary unit in the interim. Trump's damages include $129,495.15 for repairs to the broken chiller and $476,945.21 for the costs of installing and operating a temporary unit.[5]

Carrier seeks summary judgment dismissing Trump's negligence and breach of warranty claims in their entirety and limiting Trump's breach of contract claim. According to Carrier, Trump's negligence claim should be dismissed under New York's "economic loss" rule. Carrier further argues that there is no cause of action for breach of warranty where the agreement in issue is "predominantly service-oriented" and the claim is that services were rendered in a less than workmanlike manner. Finally, because the Service Agreement precludes indirect, incidental or consequential damages, Carrier seeks to limit Trump's breach of contract claim to the costs of repair, namely, $129,495.15. For the following

---

4 *See id.* ¶ 3. *See also* Your Custom Designed Service Agreement ("Service Agreement"), Ex. E to the Kendric Decl. The Service Agreement also required Carrier to calibrate safety controls. *See id.* at 6 of 11.

5 *See* Summary of Carrier Invoices, Ex. I to the Kendric Decl.

reasons, Carrier's motion is granted in part and denied in part.

## II. FACTS

On July 8, 2002, Michael McDonagh, a Trump employee and on-staff equipment operator, started one of the chiller units without noticing that the valve supplying pressurized water to that unit was in the closed position.[6] As a result, water inside the cooling tubes of the chiller was not flushed through but rather solidified and fractured the tubes, causing extensive damage to the unit.[7] Trump admits this "one part of the factual chain of events leading to the freeze-up" but denies that this was the legal cause of the freeze-up.[8] According to Trump, Carrier caused the freeze-up by improperly servicing and disabling a separate low pressure differential flow switch which is designed to prevent a freeze-up when there is no water flowing throughout the chiller.[9]

---

[6] *See* Def. 56.1 ¶ 5. McDonagh was disciplined by Trump for failing to take notice of an entry in the operation logbook, used to convey information from the previous operator's shift, which clearly advised that the valve was closed. *See id.* ¶ 7.

[7] *See id.* ¶ 6.

[8] Plaintiff's Response to Defendant's Statement Pursuant to Local Rule 56.1 and Plaintiff's Statement of Additional Material Facts that Create Genuine Issues to be Tried ("Pl. 56.1") ¶ 6.

[9] *See id.* The pressure differential flow switch is separate from the chiller and is attached to the exterior of the chiller. The chilled water inlet nozzle and the chilled water outlet nozzle are yoked together with copper tubing which leads to

Carrier's awareness of recurring problems with the pressure differential flow switch is the crux of Trump's lawsuit. Although Carrier's absorption chillers were supposed to be manufactured and operated with all applicable safeties, the two absorption chillers manufactured by Carrier did not include pressure differential flow switches, which were later added to the chillers.[10] On several occasions prior to the freezing incident, Carrier employees replaced the pressure differential flow switch attached to the chiller that froze (Carrier Chiller #1), using switches manufactured by at least two different companies.[11]

Citing an report expert, Trump claims that the problems associated with the pressure differential flow switches, which had always posed a danger to the safe operation of the chillers, were well known to Carrier.[12] Trump further claims that the pressure differential flow switch attached to Chiller #1 was

---

the pressure differential flow switch. The pressure differential flow switch measures the difference in pressure between the two outlets and is designed to shut down the unit if there is no difference in pressure indicating that no water is flowing throughout the chiller. *See id.* ¶ 14.

[10] *See id.* ¶ 15.

[11] *See id.* ¶ 16.

[12] *See id.* ¶ 17. Carrier denies these allegations on the ground that they are self-serving, conclusory, and do not have any support in the record. *See* Response to Plaintiff's Statement of Additional Material Facts Pursuant to Local Rule 56.1 ("Def. Resp.") ¶ 17.

improperly adjusted by Carrier employees who rendered the switch inoperative without warning Trump.[13]

The Service Agreement between the parties has both a warranty and a limitation of liability provision. The warranty states as follows:

> WARRANTY - CARRIER guarantees that all service provided under this AGREEMENT shall be performed in a workmanlike manner. Any claim for defective workmanship must be provided to CARRIER by written notice prior to the termination of this AGREEMENT upon which CARRIER agrees to remedy and redo any such service(s) in a timely manner without cost to the customer.
>
> CARRIER also warrants against defects in materials, and workmanship of all CARRIER part(s) or component(s) supplied hereunder for a period of one year from date of installation or until the termination date of this AGREEMENT, whichever is earlier. If any part(s) or component(s) should prove defective during the aforementioned warranty period, CARRIER will at its option repair, replace or issue credit for any such items provided they were not damaged, abused, or affected by chemical properties.
>
> THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS, IMPLIED OR STATUTORY INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.
>
> CARRIER'S obligation to repair, replace, perform a

---

[13] *See* Pl. 56.1 ¶¶ 18, 22. Carrier denies these allegations on the same grounds noted in footnote 12, *supra*. *See* Def. Resp. ¶¶ 18, 22.

> service, or issue credit for any defective part(s), component(s) or service shall be CUSTOMER'S exclusive remedy under this AGREEMENT.[14]

The following paragraph in the Service Agreement contains a "LIMITATION OF LIABILITY" clause which states: "Neither party to this AGREEMENT shall hold the other responsible for any indirect, incidental or consequential damages of a commercial nature such as, but not limited to, loss of revenue or loss of use of any equipment or facilities."[15]

As a result of the freeze-up incident, Trump submitted a claim to its insurance carrier, Hartford Steam Boiler Inspection and Insurance Company ("Hartford").[16] Hartford paid Trump and is now subrogated to the rights of its insured. The instant subrogation action was commenced against Carrier on January 31, 2003.

**III. SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

---

14 Service Agreement ¶ 4.

15 *Id.* ¶ 5.

16 *See* Def. 56.1 ¶ 8.

party is entitled to judgment as a matter of law."[17] An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[18] A fact is material when it "'might affect the outcome of the suit under the governing law.'"[19] "It is the movant's burden to show that no genuine factual dispute exists."[20]

To defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it must do more than show that there is "'some metaphysical doubt as to the material facts,'"[21] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[22] However, "'all that is required [from a nonmoving party] is that sufficient evidence

---

17 Fed. R. Civ. P. 56(c).

18 *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998)).

19 *Bouboulis v. Transport Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

20 *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

21 *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

22 *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[23]

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[24] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[25] Summary judgment is therefore inappropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."[26]

## IV. DISCUSSION

---

[23] *McClellan*, 439 F.3d at 144 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

[24] *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

[25] *McClellan*, 439 F.3d at 144 (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson*, 477 U.S. at 249.

[26] *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citing *Pinto v. Allstate Inc. Co.*, 221 F.3d 394, 398 (2d Cir. 2000)).

### A. Plaintiff's Negligence Claim

Trump alleges the following negligence claim:

> The failure of the chiller unit and resulting damages were caused by the carelessness, negligence, gross negligence, and/or negligent acts or omissions of Defendant Carrier, acting by and through its agents, servants and/or employees, acting within the scope of their employment, as follows:
>
> a) causing or allowing the chiller unit to malfunction;
>
> b) failing to exercise due care by incorrectly setting the differential pressure switch so as to cause the chiller unit's malfunction;
>
> c) failing to thoroughly inspect and maintain the chiller unit to ensure its safe and efficient operation;
>
> d) failing to properly supervise, train, and/or instruct its employees or agents;
>
> e) failing to comply with applicable industry standards, ordinances or regulations; and
>
> f) otherwise failing to exercise due care, as may be disclosed in the course of discovery.[27]

---

[27] Complaint, Ex. A to the Kendric Decl., ¶ 16.

The question raised by this motion is whether this negligence claim can survive under New York's economic loss rule. "[W]here a product fails to perform as promised due to negligence in either the manufacturing or installation process, a plaintiff is precluded from recovering tort damages for its economic loss."[28] In other words, the "economic loss doctrine provides that tort recovery in strict products liability and negligence against a manufacturer is not available to a downstream purchaser where the claimed losses flow from damage to the property that is the subject of the contract, and personal injury is not alleged or at issue."[29] In sum, the "economic loss rule reflects the principle that damages arising from the failure of the bargained-for consideration to meet the expectations of the parties are recoverable in contract, not tort."[30]

Carrier argues that New York's economic loss rule precludes Trump's negligence claim because Trump's damages are for economic loss only given that

---

[28] *Suffolk Laundry Servs., Inc. v. Redux Corp.*, 238 A.D.2d 577, 578 (2d Dep't 1997).

[29] *Weiss v. Polymer Plastics Corp.*, 21 A.D.3d 1095, 1096 (2d Dep't 2005). *Accord Atlas Air, Inc. v. General Elec. Co.*, 16 A.D.3d 444, 445 (2d Dep't 2005); *Amin Realty, LLC v. K&R Constr. Corp.*. 306 A.D.2d 230, 231 (2d Dep't 2003).

[30] *Bristol-Myers Squibb, Indus. Div. v. Delta Star, Inc.*, 206 A.D.2d 177, 181 (4th Dep't 1994).

Trump is not seeking damages for personal injury or for injury to any other property (*i.e.*, property not subject to the Service Agreement).[31] Trump responds that its negligence claim "is for negligent service to a physically distinct and separate safety switch" and, therefore, the "damage to the chiller is 'other property' that removes this case from New York's economic loss doctrine as recognized by state and federal courts applying New York law."[32] The question, then, is whether the chiller can be considered "other property" in relation to the pressure differential flow switch.

New York's economic loss rule was first espoused by the New York Court of Appeals in *Schiavone Construction Co. v. Elgood Mayo Corp.*[33] In *Schiavone*, the plaintiffs, who were engaged in subway construction, ordered and purchased a "vehicular truck hoist" from defendant Elgood.[34] Elgood, in turn,

---

31 *See* Memorandum of Law of Defendant, Carrier Corporation, in Support of Its Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 ("Def. Mem.") at 4.

32 Plaintiff's Memorandum of Law in Opposition to Carrier Corporation's Motion for Summary Judgment ("Pl. Mem.") at 5.

33 56 N.Y.2d 667, 669 (1982) (relying on the dissenting opinion of Justice Samuel J. Silverman at the Appellate Division, *see Schiavone Constr. Co. v. Elgood Mayo Corp.*, 81 A.D.2d 221, 227-34 (4th Dep't 1981)).

34 81 A.D.2d at 227.

ordered the hoist from defendant Timberland, who manufactured the hoist in accordance with Elgood's specifications.[35] Plaintiffs sued both Elgood and Timberland, alleging "that the truck hoist malfunctioned, and as a result plaintiffs suffered damages consisting of the cost of repairs to put the equipment into reasonably operable condition, and other economic loss due to downtime, loss of production, additional labor incurred, and equipment rentals."[36] The court framed the issue as "whether New York will permit a cause of action based on strict products liability as against a remote manufacturer who made no representations to plaintiffs, who has no privity of contract with plaintiffs, and where the only claim by plaintiffs is that the product failed to function properly, resulting in economic loss to plaintiffs."[37]

The Court of Appeals dismissed plaintiffs' strict liability claim against Timberland, characterizing the injuries sustained as "economic loss," and relegated

---

[35] *See id.*

[36] *Id.* at 227-28.

[37] *Id.* at 228. "But what we are here presented with is the second situation; the product is not unduly dangerous and all that is claimed is that the equipment did not function properly thus causing the owner to incur costs of repair and consequential economic loss." *Id.* at 229.

plaintiffs to their contractual remedies.[38] With reference to the dissenting opinion of the lower court, the court explained:

> We think the economic ramifications of permitting a cause of action against the manufacturer in the latter situation are so extensive and unforeseeable that it is better for the courts not to extend strict products liability to this area, leaving the owner of the product to its remedy based on its contract with the seller, and likewise leaving the seller to its remedies against the person from whom it bought the equipment based upon the contract between those parties. If there is to be so radical an extension of liability as to hold remote manufacturers liable to users, in the absence of representation or contract, for the failure of equipment to function well, it should be the Legislature that makes it after investigation of economic ramifications, which is beyond the ability of a court to do in the context of a particular case. There is room in the market for goods of varying quality, and if the purchaser buys goods which turn out to be below its expectations, its remedy should be against the person from whom it bought the goods, based upon the contract with that person.[39]

Thus, the *Schiavone* decision "reflects the principle that defects related to the quality of the product, e.g., product performance, go to the expectancy of the parties (loss of bargain) and are not recoverable in tort."[40]

---

[38] *See* 56 N.Y.2d at 669.

[39] 81 A.D.2d at 229.

[40] *Hemming v. Certainteed Corp.*, 97 A.D.2d 976, 976 (4th Dep't 1983).

Trump argues that the economic loss rule does not apply here because there was damage to other property (Chiller #1) which was separate and physically distinct from the pressure differential flow switch which is claimed to have been negligently serviced.[41] Trump cites several cases in support of the proposition that a tort remedy is available where a defective product causes damage to property other than the product itself. For example, Trump cites *Adirondack Combustion Technologies, Inc. v. Unicontrol, Inc.*[42] where the plaintiff sued the manufacturer of a controller device which failed to perform as expected and caused damage to a boiler. Although the defendant-manufacturer focused on the injury suffered and argued that "because damage was caused only to the boiler, plaintiff has no remedy in tort,"[43] the court disagreed:

> This argument is flawed because defendant's product was the controller device, not the boiler, which sustained direct and consequential physical damage as a result of the "puffback" explosion that occurred following the failure of

---

[41] *See* Pl. Mem. at 9 ("It is undisputed that the pressure differential flow switch on the unit at the time of the freeze-up did not come with the original chiller and is separately attached both by wiring and copper tubing to the chiller. As such, there was actual physical damage to other property in this negligence action and not simply economic loss for which exclusively contract principles are implicated under New York law.").

[42] 17 A.D.3d 825 (3d Dep't 2005).

[43] *Id.* at 827.

defendant's product.[44]

Trump cites *Arkwright Mutual Insurance Co. v. Bojoirve, Inc.*[45] for a similar proposition. In *Arkwright*, the plaintiff alleged that a generator failed as a result of the installation of an allegedly defective component (a faulty "governor"), which was manufactured by defendant Woodward.[46] In analyzing what constitutes "other property," the court summarized Woodward's position as follows:

> Woodward argues in the alternative that New York law does not allow this type of tort-based claim for purely economic losses, allegedly caused by a component failure. In support of this argument, Woodward cites *Bocre Leasing Corp. v. General Motors* (1995) 84 N.Y.2d 685, wherein the court precluded a tort cause of action for only economic losses, characterizing them as contractually based; and *East River S.S. Corp. v. Transamerica Delaval* (1986) 476 U.S. 858, 871, wherein the Supreme Court held that a "manufacturer in a commercial relationship has no duty under either a negligence or strict products liability theory to prevent a product from injuring itself." Woodward's argument, simply stated, is that the traditional "property damage" case - where presumably recovery would be possible - involves damage to *other* property, and that "since all but the very simplest of machines have component parts," *East River* 476 U.S. at 867, damage to the actual machine caused by failure of one of its

[44] *Id.*

[45] No. 93 Civ. 3068, 1996 WL 361535 (S.D.N.Y. June 27, 1996).

[46] *See id.* at *2.

components is not damage to "other" property.[47]

Finding that the defective governor damaged not only the generator in which it was housed but also other items of real and personal property, the court distinguished the cases cited by Woodward, stating that:

> We find that the holdings of *East River* and *Bocre* do not apply here. In *East River*, Justice Blackmun specifically limited the Court's ruling to situations where the defective instrumentality damages itself only. *See* 476 U.S. at 872. (The *Bocre* court explicitly adopted the holding in *East River*, *see* 621 N.Y.S.2d at 502). These cases do not, therefore, apply in situations where the defective product causes damage to "persons or property other than the product itself." *Bancorp Leasing & Finance Corp. v. Agusta Aviation Corp.* (9th Cir. 1987) 813 F.2d 272, 277.

Given the extensive damage to other property, the *Arkwright* court did not formally decide the question of whether the generator constitutes "other property" in relation to the governor. However, in dicta, the court stated its view that New York law would not preclude this tort-based action if only the governor and the generator had been damaged. In support of this conclusion, the following description of the governor was offered:

> First, a governor is wired into the control panel of a generator; it is an electronic monitoring device that is

---

47 *Id.* at *3 (parallel citations omitted, emphasis in original).

> physically distinct and separate from the generator. Second, the defective governor in question was either a spare part or a part cannibalized from another generator, rather than one furnished with the original generator. It appears based on this evidence that the governor was indeed property separate from the generator, and thus, in destroying the generator, it destroyed "other property."[48]

In light of the above, the court held that plaintiff's "underlying action sounds in tort as well as breach of contract" and that plaintiff stated "causes of action in negligence by alleging that defendants failed to use reasonable care in performing their duties."[49]

Trump's reliance on these cases, as well as its reliance on *Flex-O-Vit USA, Inc. v. Niagara Mohawk Power Corp.*,[50] is misplaced for several reasons. *First*, this Court disagrees with the reasoning in both *Adirondack* and *Arkwright*,

---

48 *Id.*

49 *Id.* at *4.

50 292 A.D.2d 764 (4th Dep't 2002). In *Flex-O-Vit*, plaintiff's damages did not arise from the "failure of the [ventilation fan] to perform as intended." *Id.* at 767 (quotation marks and citation omitted). Rather, plaintiff's damages arose "from an accidental fire that caused substantial direct and consequential damages, allegedly due to a defective and unsafe product marketed by [defendant]. *Id.* Here, unlike in *Flex-O-Vit*, damage to Chiller #1 was caused by the failure of the pressure differential flow switch to perform as intended, not by an accident caused by the pressure differential flow switch. Thus, *Flex-O-Vit* offers no support for Trump's position.

which is contrary to the teachings of *Bocre Leasing Corp. v. General Motors Corp.* and *East River Steamship Corp. v. Transamerica Delaval, Inc.* In *Bocre*, the Court of Appeals held that the plaintiff, "a four-times-removed-downstream purchaser of a helicopter," could not recover from the original engine manufacturer under either strict liability or negligence theories.[51] The court held that "[p]roperty damage to the helicopter itself and lost profits (lost rentals and air time) are classic contractual-type economic damages, and plaintiff could have protected itself from both types of losses via UCC warranties and insurance."[52] Furthermore, the court adopted the analysis in *East River*[53] in noting that "[t]ort recovery in strict products liability and negligence against a manufacturer should not be available to

---

[51] *See* 84 N.Y.2d at 686. In *Bocre*, the frame of a helicopter was damaged in transit after the jet engine installed by the original manufacturer caused a power loss which necessitated repairs at a remote location. *See id.* at 687-88.

[52] *Id.* at 693.

[53] In *East River*, the Supreme Court held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." 476 U.S. 858, 871 (1986). The plaintiff in *East River* alleged that "each supertanker's defectively designed turbine components damaged only the turbine itself." *Id.* at 867. The Court viewed each turbine as a single unit, noting that "[s]ince all but the very simplest of machines have component parts, [a contrary] holding would require a finding of 'property damage' in virtually every case where a product damages itself. Such a holding would eliminate a distinction between warranty and strict products liability." *Id.* (quotation marks and citation omitted, alteration in original).

a downstream purchaser where the claimed losses flow from damage to the property that is the subject of the contract."[54] The majority therefore held that plaintiff had no remedy in tort against the original manufacture because the damages sustained were only economic.[55]

This integrated approach to component/unit analysis was applied in *Progressive Insurance Co. v. Ford Motor Co.*[56] There, a defective electrical part caused a fire which ignited an entire motor vehicle (a Grand Marquis), which was purchased by an individual (Eugene Eifert).[57] Eifert's insurance company brought a products liability action against the manufacturer of the electrical part that malfunctioned.[58] The court found plaintiff to be "in a position analogous to that of the remote purchaser in the *Bocre* scenario."[59] After making the following observations, the court dismissed the case:

This case, however, cannot be viewed as one where a

---

54 84 N.Y.2d at 694.

55 *See id.*

56 790 N.Y.S.2d 358 (Dist. Ct. Nassau Co. 2004).

57 *See id.* at 359.

58 *See id.*

59 *Id.*

> defective electrical part caused damage to "other property," namely the rest of the Grand Marquis. If common experience is any guide, Eugene Eifert did not go to his Mercury dealer and purchase a collection of parts. He bought a Mercury Grand Marquis. If that was the basis of the original contract of sale, the Grand Marquis as a whole must be the standard by which the product is measured for purposes of determining whether "other property" was damaged when a component part failed. If the rule were otherwise, the Court of Appeals in *Bocre* should have allowed recovery for the airframe of the helicopter when the engine failed.[60]

Applying the reasoning in *Bocre* and *East River*, and the rationale underlying *Schiavone*, I conclude that the absorption chiller and all of its safety controls, including the pressure differential flow switch, are one integrated unit. A contrary view would result in an over-parsing of most modern mechanical devices and would represent an undue expansion of tort law into an area traditionally reserved for contract and warranty. Thus, I find that the pressure differential flow switch did not damage "other property" when it malfunctioned and caused the absorption chiller to freeze. As a result, Trump's negligence claim is dismissed.

There is, however, a second reason to dismiss the negligence cause of action. Unlike the facts presented in *Adirondack* and *Arkwright*, where independent manufacturers of allegedly defective components were being sued in

---

60 *Id.* at 360.

their own right, the parties here entered into a Service Agreement. That Service Agreement defined the parties' rights and duties with respect to all of the property in issue, including both the absorption chiller and the pressure differential flow switch. This case is closely analogous to *Bristol-Myers Squibb, Industrial Division v. Delta Star, Inc.*, where Westinghouse entered into a contract with plaintiff to install a transformer after it had been repaired.[61] The repaired transformer was installed but subsequently failed, causing a loss of electrical power to plaintiff's facility which, in turn, resulted in the loss of 40,000 kilograms of penicillin.[62] The plaintiff alleged that Westinghouse "performed its contractual obligations negligently," forcing the court to determine whether "Westinghouse's alleged negligence in installing the transformer constitutes a breach of contract, a tort, or both."[63]

In dismissing plaintiff's negligent installation claim, the court stated: "It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been

---

61 *See* 206 A.D.2d at 178.

62 *See id.* at 178-79.

63 *Id.* at 179.

violated."[64] According to the court, "[t]his legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although is may be connected with and dependent upon the contract."[65] There was, however, no proof that Westinghouse "breached a duty of reasonable care distinct from or in addition to its contractual duty to install the transformer in a proper manner."[66] Accordingly, because plaintiff could not recover for purely economic loss in tort, the court held that plaintiff's remedy was in contract.[67] Finding no distinction between product nonperformance and the negligent performance of services, the court explained:

> Whether a product fails to perform as promised due to negligence in the manufacturing process or in the installation process, recovery in negligence is unavailable for purely economic loss. Thus, the economic loss rule serves to limit the liability of providers of services as well as providers of products.[68]

---

64 *Id.* (quotation marks and citations omitted).

65 *Id.*

66 *Id.* at 180.

67 *See id.*

68 *Id.* at 181.

Here, as in *Bristol-Myers Squibb*, there is no proof that Carrier breached any legal duty independent of its contractual obligations.[69] Although it is alleged that Carrier owed an "independent duty" to Trump to properly advise it regarding the use and operation of the two chillers, no such independent duty existed.[70] The duties Carrier owed to Trump originated from the Service Agreement and nowhere else. Given the absence of any legal duty independent of the Service Agreement, Trump cannot unilaterally transform its action for breach of warranty and/or contract into a tort claim for negligence.[71] Trump's negligence claim is therefore dismissed.

**B. Plaintiff's Breach of Warranty Claim**

Trump alleges that Carrier "did not provide its services in a good and

---

69 "A legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship. Professionals, common carriers and bailees, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties." *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 551 (1992).

70 *See* Plaintiff's Response to Contention Interrogatories Directed at Plaintiff, Ex. D to Kendric Decl., ¶ 1(a).

71 *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987) ("Merely charging a breach of a 'duty of due care', employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim.").

workmanlike manner" and thereby breached the express warranty contained in the Service Agreement.[72] Carrier seeks to dismiss Trump's breach of warranty claim on the ground that "there is no cause of action available for breach of warranty when the transaction which is the basis for the complaint, as here, is 'predominantly service-oriented' and the service is claimed to have been rendered in a less than workmanlike or improper manner."[73] In response, Trump points out that the Service Agreement contains an express warranty.[74] Recognizing the weakness of its original argument, Carrier changed its position and now argues that a cause of action for breach of warranty must be brought under a breach of contract theory.[75] According to Carrier, the breach of warranty cause of action relies upon the "very same series of facts and law" as the breach of contract cause of action and should therefore be dismissed for being duplicative of the breach of contract

---

[72] *See* Complaint, Ex. A to Kendric Decl., ¶¶ 24-27.

[73] Def. Mem. at 10.

[74] *See* Pl. Mem. at 10 ("Defendant's argument is puzzling since the Service Agreement between the parties . . . plainly states that 'CARRIER guarantees that all services provided under this AGREEMENT shall be performed in a workmanlike manner.").

[75] *See* Reply Memorandum of Law of Defendant, Carrier Corporation, in Support of Its Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 ("Reply") at 8.

cause of action.[76]

Carrier offers no authority for the proposition that Trump's breach of warranty claim must be dismissed because it is duplicative of Trump's breach of contract claim. Furthermore, there appear to be different remedies for each cause of action – under the express warranty, Carrier's obligation is limited to repair, replace, perform a service, or issue credit for any defective part(s), component(s) or service.[77] On the other hand, Trump's breach of contract damages may or may not include consequential damages for items such loss of revenue and loss of use of equipment in addition to the costs of repair.[78] And although Trump cannot recover twice for the same injuries, New York law entitles a plaintiff to assert alternative theories of liability.[79] Accordingly, Trump is not required to elect one theory of

---

[76] *See id.* Carrier inadvertently cites Trump's first and third causes of action in its discussion of duplicity. *See id.* However, Trump's breach of contract claim is the second cause of action whereas the breach of warranty claim is the third. Trump's first cause of action is its negligence claim, which has already been addressed.

[77] *See* Service Agreement ¶ 4.

[78] *See infra* Part IV.C.

[79] *Cf. Comsewogue Union Free Sch. Dist. v. Allied-Trent Roofing Sys., Inc.*, 15 A.D.3d 523, 524 (2d Dep't 2005) (affirming lower court's rejection of plaintiff's alternative cause of action for breach of warranty presented six years after plaintiff's breach of contract claim).

recovery over the other.[80] Carrier's motion for summary judgment on Trump's breach of warranty claim is denied.

**C. Limitation on Damages**

Carrier seeks to limit Trump's damages under the Limitation of Liability provision contained in the Service Agreement. Under the provision, Trump's damages would be limited to the costs of repair, namely, $129,495.15. Trump opposes such limitation on the ground that "Carrier may not contractually insulate itself from damages caused by grossly negligent conduct due to public policy concerns."[81]

The first issue concerns the enforcement of such a limitation provision. New York courts "have long held that parties to a commercial contract, absent any question of unconscionability, may agree to limit the seller's liability

---

80 *See U.S. Network Servs., Inc. v . Frontier Commc'ns of the West, Inc.*, 115 F. Supp. 2d 353, 358 (W.D.N.Y. 2000) (citing *Fink v. DeClassis*, 745 F.Supp. 509, 515 (N.D. Ill. 1990) (stating that a breach of warranty claim was not redundant of a breach of contract claim, even though the claims sought essentially the same relief and plaintiff could not obtain duplicative recovery, because the plaintiff was entitled to assert alternative theories and could not be forced to elect one remedy over another in the absence of prejudice to the defendant)).

81 Pl. Mem. at 11.

for damages."[82] Whether such a provision is unconscionable presents a question of law for the Court to resolve.[83] Here, both parties are sophisticated business entities who voluntarily entered the Service Agreement without duress or coercion. I therefore find the Limitation of Liability provision to be enforceable.[84]

However, it is the public policy of the State of New York "that a party may not insulate itself from damages caused by grossly negligent conduct."[85] This exception applies equally to contract clauses exonerating a party from all liability as well as clauses limiting damages.[86] Gross negligence "differs in kind, not only

---

[82] *Mom's Bagels of N.Y., Inv. v. Sig Greenebaum, Inc.*, 164 A.D.2d 820, 822 (1st Dep't 1990).

[83] *See Scott v. Palermo*, 233 A.D.2d 869, 872 (4th Dep't 1996).

[84] *See Peluso v. Tauscher Cronacher Prof'l Eng'rs, P.C.*, 270 A.D.2d 325, 325 (2d Dep't 2000) ("Here, there is no special relationship between the parties, no pertinent statutory provision, and no overriding public interest which demands that this contract provision, voluntarily entered into by competent parties, should be rendered ineffectual.").

[85] *Sommer*, 79 N.Y.2d at 554. *Accord Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs., Ltd.*, 81 N.Y.2d 821, 823 (1993) ("Public policy, however, forbids a party's attempt to escape liability, through a contractual clause, for damages occasioned by grossly negligent conduct.") (quotation marks and citation omitted).

[86] *See Sommer*, 79 N.Y.2d at 554.

degree, from claims of ordinary negligence."[87] When used in this context, gross negligence "is conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing."[88]

While gross negligence may be found as a matter of law in some limited instances, this is not such a case. Although Carrier argues that Trump has only *alleged* gross negligence but has failed to cite any evidence to support this claim, that is not entirely true. In fact, Trump has offered the report of its expert who has opined that: "The PDSF's furnished by Carrier in the original installation was found to be tampered with by Carrier and rendered inoperative."[89] This statement implies intentional conduct on the part of Carrier. And while it may not be the most persuasive evidence, it does raise a question of fact as to whether Carrier was grossly negligent with regard to the pressure differential flow switch. Because the nature of Carrier's conduct cannot be determined as a matter of law, the provision in the Service Agreement foreclosing indirect, incidental and consequential damages may or may not be eventually enforced. At this time,

---

[87] *Colnaghi*, 81 N.Y.2d at 823.

[88] *Id.* at 823-24 (quoting *Sommer*, 79 N.Y.2d at 554).

[89] Expert Report of Edward Deeb, Ex. 1 to Pl. 56.1, at 4.

Carrier's motion to enforce the limitation of liability provision is denied, subject to renewal at a later date.[90]

## V. CONCLUSION

For the foregoing reasons, Carrier's motion to dismiss Trump's first cause of action for negligence is granted. Carrier's motion to dismiss Trump's third cause of action (breach of warranty) is denied. Carrier's motion to limit Trump's second cause of action (breach of contract) is also denied, without prejudice to subsequent reconsideration. The Clerk of the Court is directed to close this motion [Document #29]. A conference is scheduled for November 13, 2007, at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
October 23, 2007

[90] Carrier may move for a directed verdict on the issue of gross negligence at the close of plaintiff's case, which may be granted depending on the strength of the evidence. If denied, the issue of gross negligence will be decided by the jury, which will be appropriately instructed.

## - Appearances -

**For Plaintiff:**

Mark T. Mullen, Esq.
Cozen O'Connor
The Atrium - Third Floor
1900 Market Street
Philadelphia, PA 19103
(215) 665-2091

**For Defendant:**

John J. Ryan, Esq.
Ahmuty, Demers & McManus
200 I.U. Willets Road
Albertson, NY 11507
(516) 294-5433